# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

**JUANA MONTANO-PEREZ, *et al*.,**      )
                                    )
        **Plaintiffs,**             )
                                    )
**v.**                                    )     **Case No. 3:08-1015**
                                    )     **Judge Trauger**
**DURRETT CHEESE SALES, INC., *et al.*,**   )
                                    )
        **Defendants.**           )
                                    )

## MEMORANDUM

Pending before the court is a Motion to Dismiss (Docket No. 45) filed by the defendants Coffee County, Tennessee, Charles Jones, Ryan Barker[1], Chad Partin, Pam Freeman, and Steve Graves. Also pending is the plaintiffs' Motion for Leave to File First Amended Complaint (Docket No. 53). For the reasons discussed herein, the defendants' motion will be denied in almost all respects, and the plaintiffs' motion will be granted.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The twelve plaintiffs claim that they were victims of workplace discrimination and retaliation perpetrated by their former employers and by officers of the Sheriff's Department of Coffee County, Tennessee.[2] The plaintiffs' former employers are Durrett Cheese Sales, Inc., and

---

[1] In the motion and briefing, the defendants refer to this defendant, at times, as "Ryan Baker," although Ryan Barker is the name of the individual who was sued. (Docket No. 1 Ex. 5 at 9.)

[2] Unless otherwise noted, the facts are drawn from the Complaint (Docket No. 1).

1

its President, Greg Durrett (the "Durrett Defendants").  Durrett Cheese is a corporation located in Manchester, Tennessee that is engaged in the business of processing, converting, and packaging dairy products for sale in interstate commerce.  The Durrett Defendants are not parties to the pending motion to dismiss, which is brought only by the defendants associated with the Coffee County Sheriff's Department ("the County Defendants").

The plaintiffs are Latino immigrants who moved to the Manchester, Tennessee, area from impoverished regions of Mexico.  The plaintiffs speak either Mixteco, an indigenous Mexican language, or Spanish as their primary language.  Shanna Ramirez was a supervisor with Durrett Cheese during the relevant time period, and she recruited and hired members of the Mixteco community in Manchester to work in non-supervisory positions with Durrett Cheese.  Mostly all of the non-supervisory positions in the Durrett Cheese factory were filled by Latino workers of Mexican descent.  The plaintiffs were hired by Durrett Cheese at various points in the late 2006 to late 2007 time period.  After being hired, the plaintiffs performed various jobs in the factory, including "in-line" jobs slicing, packaging, and processing cheese for sale.  At the time of hire, the plaintiffs understood that Durrett Cheese would pay them on a weekly basis at an hourly rate between approximately $6.00 and $6.75 per hour.

The plaintiffs' employment with Durrett Cheese was problematic.  The plaintiffs' direct supervisor, Ms. Ramirez, frequently made offensive and potentially humiliating comments to the plaintiffs about their race, national origin, intelligence, language, and customs, among other things.  Durrett Cheese also frequently failed to timely pay the plaintiffs at the applicable federal minimum wage.  These problems persisted before and after Durrett Cheese's August 2007

2

bankruptcy filing.

Indeed, in many workweeks in August, September, and October 2007, Durrett Cheese grossly underpaid the plaintiffs. In some workweeks during this time period, the plaintiffs were not paid at all, and some plaintiffs worked for more than a month during this time period without being paid. The plaintiffs regularly requested their unpaid wages during this period, often approaching Ramirez in groups to inquire about their pay. Acting through Ramirez, Durrett Cheese either postponed pay days or simply refused to pay the plaintiffs for the work they had performed. Ramirez convinced the plaintiffs to continue working by telling them that they would not receive their back pay if they quit, and that they would receive more back pay if they worked at higher production levels.

The tension over pay and working conditions came to a head in October 2007. On Friday, October 19, 2007, the plaintiffs made repeated requests to Ramirez for several weeks of back pay. Ramirez informed the plaintiffs that they would not be paid until the following Monday. On hearing this news, the plaintiffs met to plan a collective action to protest the continued non-payment of wages.

The following Monday, October 22, 2007, during the usual mid-morning break, the plaintiffs assembled in the Durrett Cheese break room and again requested their overdue pay from Ramirez. The plaintiffs were told by Ramirez that no checks would be distributed until defendant Durrett arrived, and, until that time, the plaintiffs could either return to work or leave for good (and risk never receiving their back pay). The plaintiffs refused to return to work, stating that they would only do so when they received their wages. In response, Ramirez fired

the plaintiffs and ordered them off company property. The plaintiffs informed Ramirez that they would not leave the break room until they received their wages.

As the plaintiffs continued to wait in the break room, Ramirez conferred with Ron Girts, another supervisor at Durrett Cheese, and defendant Durrett. Defendant Durrett ordered Girts and Ramirez to call the Coffee County Sheriff's Department. Officer-defendants Jones, Partin, and Barker responded to the call and headed to the Durrett Cheese factory. When the officers arrived, Ramirez, Girts, and the plaintiffs informed the officers that management and the employees were engaged in a dispute over unpaid wages. The officers noted the nature of the dispute in their incident report.

The plaintiffs allege that, at this point, the officers with the Coffee County Sheriff's Department and the supervisors employed by Durrett Cheese began working together to defeat the plaintiffs' wage complaints. For instance, a supervisor, either Ramirez or Girts, informed the officers that the plaintiffs were undocumented immigrants and should, therefore, be reported to Immigration and Customs Enforcement (ICE). The officers were also provided with paperwork from Durrett Cheese to assist in reporting the plaintiffs.

The officers told the plaintiffs that, if they did not leave the Durrett Cheese premises, they would be arrested and taken to the Coffee County jail. After the plaintiffs expressed their intent to remain in the break room, the officers arrested the plaintiffs and transported them, via Sheriff's Department van, to the Coffee County jail. The officers' supervisors, defendants Freeman and Graves, were advised of the situation as it unfolded and approved of the arrests. During the arrests, the officers, along with Ramirez, laughed at the plaintiffs, referred to the

4

plaintiffs' race and national origin, and made statements about sending the plaintiffs "back to Mexico." In total, the entire work stoppage incident lasted less than two hours, and, at all times, it was peaceful and entirely confined to the Durrett Cheese break room

At the Coffee County jail, the plaintiffs were booked on charges of trespassing and were detained. Over the course of the day on October 22, the plaintiffs were separated from their families and kept in the dark about what would happen to them. The plaintiffs slept on mattresses in a crowded jail cell and were denied free access to restroom facilities. The next day, October 23, the Coffee County District Attorney dropped all charges against the plaintiffs.

The plaintiffs allege that, while they were detained, defendants Graves and Freeman consulted with supervisors at Durrett Cheese as to how to proceed, in light of the ongoing labor dispute between Durrett Cheese and the plaintiffs. Durrett Cheese and defendant Graves agreed that, regardless of the charges being dropped, the plaintiffs would remain at the Coffee County jail and that the plaintiffs would be reported to ICE. Shortly after this conversation, defendant Freeman contacted ICE to report the plaintiffs as suspected undocumented immigrants. On October 24, agents from ICE arrived at the Coffee County jail, and, at the behest of the County Defendants, transported the plaintiffs to a detention center in Nashville, Tennessee, where the plaintiffs, very fearful of what would happen to them and their families, were interrogated for several hours before their attorney was able to secure their release.

## ANALYSIS

The plaintiffs have filed an eight-count Complaint against the defendants arising from the plaintiffs' termination from Durrett Cheese and from the subsequent legal proceedings involving

individuals from the Coffee County Sheriff's Department. Counts V, VI, and VIII are asserted against the Durrett Defendants only and are not at issue here. The remaining counts are asserted against all defendants, but the court focuses on the County Defendants, as they have filed the Motion to Dismiss.

Count I alleges that the County Defendants retaliated against the plaintiffs in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 215(a)(3). Count II alleges that the County Defendants violated the plaintiffs' rights under 42 U.S.C.§ 1981, by denying the plaintiffs the right to make and enforce contracts on the same terms as white citizens. Count III asserts a claim under Section 1983 against the County Defendants arising from the alleged conspiracy to violate the plaintiffs' rights under the Fourth Amendment, Section 1981, the National Labor Relations Act (NLRA), 29 U.S.C. § 141 *et seq.*, and the FLSA. Count IV alleges that the County Defendants violated 42 U.S.C. § 1985, by engaging in a conspiracy driven by racial animus to deprive the plaintiffs of the equal protection of the laws. Finally, Count VII alleges that the County Defendants negligently inflicted emotional distress on the plaintiffs ("NIED" claim). The County Defendants have moved to dismiss these claims under Federal Rule of Civil Procedure 12(b)(6), and the plaintiffs have moved to amend their Complaint to add additional claims against the Durrett Defendants, as well as to "provide additional factual support" for the claims in the original Complaint and "to correct previously undetected minor errors."[3] (Docket No. 53 at 1.)

---

[3] While the County Defendants "move for complete dismissal of Plaintiffs' Complaint," the court can locate no discussion in the County Defendants' briefing of the plaintiffs' NIED claim. (Docket No. 45 at 1.)

I.       Standard of Review

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).  The Federal Rules of Civil Procedure require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer*, 416 U.S. at 236.  Rather, challenges to the merits of a plaintiff's claim should be "dealt with through summary judgment under Rule 56." *Swierkiewicz*, 534 U.S. at 514.

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964-65 (2007), the Supreme Court readdressed the pleading requirements under the federal rules.  The Court stressed that, although a complaint need not plead "detailed factual allegations," those allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 1964-65.  "The factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Twombly*, 127 S.Ct. at

7

1965).  Further, the Court observed that Federal Rule of Civil Procedure 8(a)(2) does require a "showing" that the plaintiff is entitled to relief and that this substantive threshold is not achieved by "blanket assertion[s]." *Twombly*, 127 S.Ct. at 1965 n.3.

Although Federal Rule of Civil Procedure 8 establishes a "liberal system of notice pleading," *see E.E.O.C. v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1964-65 (citing *Papasan v. Allain,* 478 U.S. 265, 286 (1986)). Accordingly, to survive a motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. at 1965; *see also Swierkiewicz,* 534 U.S. at 508 n.1; *Neitzke v. Williams,* 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer,* 416 U.S. at 236 (a well-pleaded complaint may proceed, even if it appears "that a recovery is very remote and unlikely").

In *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 2009 WL 1361536 (May 18, 2009), the Court further expounded on the "two working principles" that underlie the *Twombly* decision.  *Id.* at 1949.  First, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim under the federal rules.  *Id.*  Second, "only a complaint that states a plausible claim for relief survives a

8

motion to dismiss." *Id.* at 1950. To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 1949.

Further, the Court explained that determining "facial plausibility" is a "context-specific task," in which the reviewing court must "draw on its judicial experience and common sense." *Id.* at 1950. Where, using this background, the court finds that "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. Rule Civ. Proc. 8(a)(2)). The Court noted that, "[i]n keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

II.     FLSA Claim

As noted above, the plaintiffs allege that the County Defendants violated Section 215(a)(3) of the FLSA. In relevant part, that provision states: "it shall be unlawful for any person to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3). The Sixth Circuit has consistently interpreted an informal complaint to management regarding working conditions to constitute a "filed complaint" under

9

Section 215(a)(3). *Moore v. Freeman*, 355 F.3d 558, 562 (6th 2004); *EEOC v. Romeo Community Schools*, 976 F.2d 985, 989 (6th Cir. 1992). While there does not appear to be a wealth of law on this subject from the Sixth Circuit, it appears clear that, given the broad language of this provision, entities other than an individual's employer can violate the FLSA. *See e.g. Centeno-Bernuy v. Perry*, 302 F. Supp. 2d 128, 135 (W.D.N.Y. 2003); *Meek v. United States*, 136 F.2d 679, 679-80 (6th Cir. 1943).

In asserting that the plaintiffs' FLSA claim should be dismissed as to them, the County Defendants argue that the plaintiffs' Complaint does not establish the *prima facie* case for retaliation under the FLSA, and, even if it did, the claim could not survive the well-known *McDonnell Douglas* burden-shifting analysis that is typically applied in employment discrimination and retaliation suits, including claims brought under the FLSA. (Docket No. 46 at 4, citing *Williams v. GM.*, 187 F.3d 553, 568 (6th Cir. 1999)).

This is not a proper argument at this stage in the proceedings. In employment discrimination and retaliation suits, the plaintiff is not required, at the pleading stage, to demonstrate a *prima facie* case or to survive *McDonnell Douglas* burden shifting. *See Swierkiewicz*, 534 U.S. at 508; *EEOC v. FPM Group, Ltd.*, 2009 WL 3088808, *6 (E.D. Tenn. Sept. 28, 2009). Rather, as discussed above, in order to survive a motion to dismiss, the plaintiff's Complaint need only outline a "facially plausible" claim for relief.

The plaintiffs have met that burden here. Again, the language of the FLSA provision at issue is very broad, prohibiting "any person" from "discriminat[ing]" against "any employee," because that employee has filed a covered workplace complaint. 29 U.S.C. § 215(a)(3). Further,

10

the County Defendants recognize that retaliatory reporting of an employee to immigration authorities could constitute "discrimination" under this provision. (Docket No. 46 at 6; *see also Singh v. Jutla*, 214 F.Supp. 2d 1056, 1062 (N.D. Cal 2002)(denying motion to dismiss FLSA retaliation claims where allegations centered on an employer's reporting of the employee to immigration authorities in retaliation for FLSA protected conduct); *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 147 (6th Cir. 1977)(equating FLSA discrimination to "black listing" and other actions that prevent an employee from gaining future employment.)

Providing significant factual support, the plaintiffs have alleged that the County Defendants, working in concert with the Durrent Defendants, arrested the plaintiffs and then reported the plaintiffs to ICE because of the plaintiffs' complaints about pay. While the County Defendants claim that the plaintiffs have only alleged a racial or ethnic animus as motivation for the defendants' conduct here, that is simply not the case. (Docket No. 46 at 6.) The Complaint contains numerous allegations, backed by factual support, that the County Defendants reported the plaintiffs to ICE, at least in part, because the plaintiffs had made a complaint about pay.

The plaintiffs allege that, shortly after the officers arrived at the break room, they were advised that this was a dispute about pay. Then, "Ramirez and/or Girts supplied Defendants Jones, Partin, and Barker with paperwork to assist the Coffee County Defendants in reporting Plaintiffs to ICE." (Docket No. 1 at 15.) There is no indication from the Complaint that Jones, Partin and Barker attempted to mediate or resolve the labor dispute; rather, it is clear from the Complaint that, throughout the entire process, the County Defendants simply imposed the will of the Durrett Defendants, which was to permanently remove the plaintiffs from the premises (and,

11

perhaps, the country) because the plaintiffs had complained about pay. Indeed, the Complaint alleges that, after the charges were dropped, defendant Graves "consult[ed] with the Durrett Defendants and with full awareness that he was unlawfully intervening in a labor dispute, defendant Graves instructed defendant Freeman to call ICE to report Plaintiffs as suspected undocumented immigrants. Defendant Freeman did so on or about October 22 or October 23, 2007." (*Id.* at 16.)

Clearly, accepting the plaintiffs' allegations as true and drawing all reasonable inferences in the plaintiffs' favor, the plaintiffs have sufficiently alleged that the County Defendants violated the FLSA. The plaintiffs allege, with specific factual support, that, in response to the plaintiffs' complaint about pay, the County Defendants not only had the plaintiffs arrested but worked in concert with the Durrett Defendants to have the plaintiffs reported to ICE. As to this claim, the County Defendants' Motion to Dismiss, which is premised on the notion that the FLSA claim lacks factual support, will be denied.[4]

III.    Section 1981 Claim

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is

---

[4] While the County Defendants note that the issue of non-employer civil liability for FLSA violations is apparently one of first impression in this circuit (Docket No. 46 at 4), at least one court outside of the circuit has found that, while "any person" can violate the FLSA, the remedial scheme established by Congress only permits private plaintiffs to sue *employers* for civil remedies under the FLSA. *See O'Brien v. DeKalb-Clinton Counties Ambulance District*, 1996 WL 565817, *5 (W.D. Mo. Jun. 24, 1996). Further briefing on this issue in conjunction with any summary judgment motions would be welcome.

12

enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981. The statute, therefore, "prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors." *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006). The statute defines "make and enforce contracts" to include the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

In challenging the plaintiffs' Section 1981 claim, the County Defendants, again, attempt to apply the *McDonnell Douglas* burden-shifting approach to argue that the plaintiffs have failed to state a claim under Section 1981. (Docket No. 46 at 9.) As discussed above, the plaintiffs are not required to prove their case at this point, and the plaintiffs need only state a "plausible claim" for relief in order for this claim to move forward.

Aside from this, the County Defendants argue that the plaintiffs had no right to be in the break room once they were terminated, that is, the "right [to seek enforcement of an employment contract] ... does not exist if it involves trespassing on private property." (*Id.*) They also argue that "close scrutiny of the Complaint shows that Plaintiffs have failed to allege that the [County] Defendants themselves intentionally discriminated against Plaintiffs." (*Id.* at 10.)

These latter two arguments are also unavailing. First, the County Defendants' trespassing argument is "supported" by Supreme Court cases in which the Court concludes that "free speech" rights may be more circumscribed for trespassers than for others. *See e.g. U.S. v. Grace*, 461 U.S. 171, 177-78 (1983). As the plaintiffs point out, in the employment context, the

13

NLRA appears to protect the rights of employees to remain on company property, at least for brief periods, to peacefully protest illegal working conditions and pay schemes. (Docket No. 50 at 10, citing *e.g. Crenlo v. NLRB*, 529 F.2d 201, 204 (8th Cir. 1975); *NLRB v. Pepsi-Cola Bottling Co.*, 449 F.2d 824, 829 (5th Cir. 1971)). Moreover, at least at this stage of the proceedings, whether there is an arguable inference that the plaintiffs were technically trespassing here seems at most tangential to the core issue, which is whether the County Defendants, driven by racial animus, denied the plaintiffs "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

Second, contrary to the County Defendants' argument, the plaintiffs have pleaded multiple facts in support of their assertion that racial and ethnic animus toward the plaintiffs was a driving factor behind the County Defendants' conduct, that is, arresting the plaintiffs, detaining them, and reporting them to ICE. For instance, the plaintiffs allege that, at the time of the arrest, officers Barker, Partin, and Jones, "laughed at Plaintiffs, referenced Plaintiffs' race and national origin, and made statements regarding their intent to send Plaintiffs 'back to Mexico.'" (Docket No. 1 at 15.) Moreover, the plaintiffs allege that the only bases the County Defendants had for concluding that the plaintiffs were undocumented workers were the "plainly retaliatory accounts provided by the Durrett Defendants and their agents" and the County Defendants' own "perceptions regarding Plaintiffs' apparent race and/or national origin." (*Id.* at 17.)

Again, taking the Complaint allegations as true and drawing all reasonable inferences in favor of the plaintiffs, the plaintiffs have plainly alleged that the County Defendants were driven by racial animus when they arrested, detained and reported the plaintiffs, thereby denying the

14

plaintiffs an opportunity to bargain for their agreed-upon wage. Therefore, the County

Defendants' Motion to Dismiss will be denied as to this claim.[5]

## IV. Section 1985 Claim

As noted above, the plaintiffs also assert a Section 1985(3) claim against the County

Defendants. Section 1985(3) "creates a cause of action for conspiracy to violate civil rights,"

that is, to deprive a person of equal protection and privilege under the law. *Center for Bio-*

*Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 832 (6th Cir. 2007); 42 U.S.C. §

1985(3). A Section 1985(3) "complaint must allege both a conspiracy and some class-based

discriminatory animus behind the conspirators' action." *Id.* (internal quotation omitted).

Furthermore, conspiracy claims must be pleaded with "specificity," and unsupported, "vague and

conclusory allegations" of conspiracy are not sufficient to state a claim under Section 1985(3).

*Id.*

In challenging the plaintiffs' Section 1985(3) claim, the County Defendants "cherry pick"

certain language from the plaintiffs' Complaint and contend that the plaintiffs' conspiracy

allegations are conclusory and "mere recitals of the elements" of a Section 1985(3) cause of

action. (Docket No. 46 at 12.) As discussed above, however, the plaintiffs have alleged facts

---

[5] While the County Defendants do not raise this issue, it is worth noting that there is no independent private right of action against state actors under Section 1981; rather allegations against state actors premised on Section 1981 must be raised through the exclusive remedy of Section 1983. *See Baker v. Shelby County Gov't*, 2006 WL 2927687, *2 (W.D. Tenn. Oct. 11, 2006)(citing *Jett v. Dallas Independent Sch. Dist.*, 491 U.S. 701, 736 (1989)). As discussed herein, the plaintiffs assert Section 1981 liability against the County Defendants independently and under Section 1983. To the extent discovery and further investigation reveals that all actions taken by the County Defendants here were "state action," the plaintiffs' independent Section 1981 claim would not be viable.

15

that, taken as true, demonstrate a clear factual basis for the conspiracy claims. That is, the plaintiffs allege that, beginning in the break room and continuing for a few days, the County Defendants and the Durrett Defendants had a working relationship in which the County Defendants agreed to carry out the will of the Durrett Defendants, which involved arresting the plaintiffs and having the plaintiffs reported to ICE for having complained about their pay and for being individuals of Latino descent. The plaintiffs, therefore, have sufficiently alleged both the required conspiracy and the necessary "class-based discriminatory animus" that drove the decisions to deny the plaintiffs equal protection under the laws. Therefore, the County Defendants' Motion to Dismiss will be denied as to this claim.

## V.     Section 1983 Claims

In Count III, the plaintiffs claim that the County Defendants acted under color of state law in denying the plaintiffs their rights under the Fourth Amendment, Section 1981, the NLRA, and the FLSA. (Docket No. 1 at 22-24.) It is important to note that the Section 1983 claims, while they are premised, in part, on violations of the FLSA and Section 1981, are technically distinct from the claims discussed above, in that the Section 1983 claims are premised on violations that allegedly occurred under color of state law. As to the Section 1983 claims, the County Defendants largely rely on qualified immunity.

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 749 n. 9 (1999)(internal quotation omitted). Under the doctrine of qualified immunity, government

16

officials performing discretionary functions "generally are shielded from liability for civil damages [under Section 1983] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Generally, the qualified immunity inquiry involves first determining whether a constitutional or statutory violation occurred, and, if so, then determining if the right infringed was clearly established. *McKinley v. City of Mansfield*, 404 F.3d 418, 429-30 (6th Cir. 2005). However, courts should use their discretion and may consider the issue of whether the right was clearly established first, if such an analysis is appropriate "in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

Once a government official raises the defense of qualified immunity, the plaintiffs must plead and prove with some particularity the existence of a clearly established right that the official is alleged to have violated. *Dominque v. Telb,* 831 F.2d 673, 676 (6th Cir.1987). Whether immunity attaches depends upon the "objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Harlow,* 457 U.S. at 818. The official is entitled to dismissal if the facts as alleged do not support a claim of violation of clearly established law. *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). To determine whether a right has been clearly established, courts look to "the federal constitutional, statutory, and case law existing at the time of the challenged action." *Rodgers v. Jabe,* 43 F.3d 1082, 1085 (6th Cir.1995) (citation omitted).

A.    NLRA Claim

The County Defendants argue that the plaintiffs may not assert rights against them under the NLRA through the vehicle of Section 1983, and, even if they could, any such rights would not be clearly established. (Docket No. 46 at 13-14.) However, the Supreme Court has held that employees' rights under the NLRA are protected against governmental interference and are enforceable through Section 1983. *Livadas v. Bradshaw*, 512 U.S. 107, 133-34 (1994). Therefore, the County Defendants' first argument, that NLRA rights cannot be enforced against government officials through Section 1983, is without merit.

Next, the County Defendants argue that any such rights under the NLRA are not "clearly established," and, therefore, the County Defendants are entitled to qualified immunity. The County Defendants argue that they have located "no case law extending the retaliation provisions of the NLRA to police officers called to remove employees who have been fired for alleged improper purposes and in alleged violation of the NLRA." (Docket No. 46 at 14.)

The County Defendants define the right at issue too narrowly; that is, by its plain terms, the NLRA grants employees, such as the plaintiffs, the right to self-organize, bargain collectively and otherwise "engage in [] concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. The plaintiffs have alleged that the County Defendants terminated the plaintiffs' attempts to negotiate with management and hauled the plaintiffs off to jail and then before ICE, all to prevent the plaintiffs from collectively bargaining with management for their wages. In so doing, the plaintiffs have certainly alleged that the County Defendants violated clearly established rights to engage in collective bargaining activities.

18

B.    FLSA Claim

While the County Defendants do not raise this issue, numerous courts have concluded that a "plaintiff may not seek relief under Section 1983 for violations of the FLSA." *O'Hara v. Mount Vernon Bd. of Education*, 16 F. Supp.2d 868, 895 (S.D. Ohio 1998)(collecting cases); *Cavin v. Honda of Am. Manufacturing*, 138 F. Supp.2d 987, 993 (S.D. Ohio 2001); *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 194 (4th Cir. 2007)(citing *Kendall v. City of Chesapeake*, 174 F.3d 437, 443 (4th Cir. 1999)).  Therefore, the plaintiffs may not assert their FLSA claim through the vehicle of Section 1983.  The County Defendants' motion to dismiss this aspect of the Section 1983 claim will be granted.

C.    Section 1981 Claim

As discussed above, the plaintiffs' Section 1981 claim alleges that the County Defendants, fueled by racial animus, denied the plaintiffs the right, protected under Section 1981, to "make and enforce contracts" as that right is "enjoyed by white citizens."  In this section of their briefing, the County Defendants largely put forth the same challenges to the Section 1981 claim that were addressed above, that is, the County Defendants (1) cite the same inapposite free speech cases, (2) argue that the plaintiffs' Complaint makes insufficient allegations of a contractual relationship and of racial animus and (3) argue that the right to enforce contracts does not apply if the plaintiffs are trespassing.  (Docket No. 46 at 17–18.) These arguments are rejected for the same reasons as above.

In passing, the County Defendants argue that they are entitled to qualified immunity because "the right to protest non-payment of wages on private property after being asked to

19

leave" was not clearly established.  (*Id.* at 18.)  Again, the County Defendants miscast the right at issue, which, again, is clearly established by the statute.  Section 1981 grants all citizens the right to "make and enforce contracts" without regard to race, and defines "making and enforcing contracts" to include all of the attendant characteristics, privileges and benefits of contractual relationships.  This is the right that the plaintiffs allege that the County Defendants infringed upon, and, as this right was clearly established by the statute, the County Defendants' qualified immunity argument fails.

      D.      Fourth Amendment

      The plaintiffs also advance their Section 1983 claim on the grounds that the County Defendants violated their Fourth Amendment rights by arresting them without probable cause. (Docket No. 1 at 22); *Crockett v. Cumberland College*, 316 F.3d 571, 580 (6th Cir. 2003)("It is well established that any arrest without probable cause violates the Fourth Amendment.")  For probable cause for an arrest to exist, the "facts and circumstances within the officer's knowledge must be sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003)(internal citation and quotation omitted).  Whether "a probability of criminal activity" exists is assessed under a "reasonableness standard" that is based on a consideration of "all facts and circumstances within an officer's knowledge at the time of an arrest."  *Id.*  In short, "there is no precise formula for determining the existence or nonexistence of probable cause; rather, a reviewing court is to take into account the factual and practical considerations of everyday life that would lead a

20

reasonable person to determine that there is a reasonable probability that illegality has occurred." *U.S. v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998)(internal quotation omitted).

In their motion to dismiss, the County Defendants argue that the plaintiffs' Complaint does not sufficiently show that the County Defendants lacked probable cause to arrest the plaintiffs for trespassing, largely because the Complaint concedes that the plaintiffs were terminated and ordered off of company property prior to the arrests, and because Tennessee law prohibits one from knowingly entering or remaining on the property of another without the owner's effective consent. (Docket No. 46 at 20 citing T.C.A. § 39-14-405.) The County Defendants also argue that, to the extent labor law provisions in the NLRA or FLSA permitted the plaintiffs to remain in the break room even after they were terminated, the rights granted by those provisions are not so clearly established that the defendants should have been on notice of them. (Docket No. 46 at 20.) Therefore, the County Defendants argue, even to the extent that the arrests violated the plaintiffs' Fourth Amendment rights, they are entitled to qualified immunity.

As indicated above, probable cause determinations are factually intensive inquiries that are generally inappropriate in the context of a motion to dismiss. *See Wright v. King*, 2007 WL 80844, *2 (M.D. Fla Jan. 8, 2007); *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d. 1336, 1347 (7th Cir. 1985); *Harris v. Roderick*, 933 F. Supp. 977, 985 (D. Idaho 1996). If the Complaint permitted no plausible claim that the plaintiffs had been arrested without probable cause, then dismissal of the Section 1983/Fourth Amendment claim might be appropriate. *See id.* Here, however, the plaintiffs' allegations state a plausible claim that the plaintiffs were arrested

21

without probable cause. For instance, the allegations suggest that the responding officers ignored the plaintiffs' protests regarding the pay dispute and simply adopted the County Defendants' position that the plaintiffs were trespassing without any investigation. Moreover, the Complaint suggests that certain County Defendants kept the plaintiffs detained after the trespassing charges were dropped, solely based on their racial biases and information provided by the obviously biased Durrett Defendants. On these allegations, whether probable cause existed for the arrest can only be determined through discovery and further factual investigation.

Also, again, the County Defendants are not entitled to qualified immunity. The law that no individual may be arrested without probable cause is clearly established. As discussed above, whether there was probable cause to arrest the plaintiffs is not a matter that can be resolved at this stage in the proceedings.

VI.     Motion for Leave to Amend

As noted above, the primary purpose of the plaintiffs' Motion for Leave to File First Amended Complaint is to amend their Complaint to add an additional claim against the Durrett Defendants. Also, the proposed Amended Complaint would provide some additional factual support for the plaintiffs' claims against the County Defendants. As to the County Defendants, the Amended Complaint adds the allegations (1) that the arresting officers did not employ a neutral interpreter to facilitate their understanding of the events in the break room but, instead, relied on Ms. Ramirez to interpret what the plaintiffs were saying; (2) that the plaintiffs explicitly told the arresting officers that they were waiting in the break room in order to be paid; (3) that the County Defendants had no authorization to enforce immigration laws and no training

22

in how to determine immigration status; and (4) that the plaintiffs were treated differently by the County Defendants from other similarly-situated individuals because of their race and because of their workplace dispute. (See Docket No. 55 at 2-3.)

After responsive pleadings are filed, a party may amend its complaint only with leave of court or with written consent of opposing counsel.[6] Fed. R. Civ. P. 15(a). Rule 15(a) provides that leave to amend a pleading should be freely given "when justice so requires." *Id.* Generally, leave should be given unless there is a showing of undue delay, bad faith or dilatory motive on the part of the moving party, undue prejudice to the non-moving party, or futility of the proposed amendment. *Id.*; *see also Hahn v. Star Bank*, 190 F.3d 708, 715 (6th Cir. 1999).

The plaintiffs addressed many of these grounds in their briefing on this motion, arguing that the motion for leave to amend was timely, in good faith, non-prejudicial, and not futile. (Docket No. 54 at 3-7.) In response, the County Defendants argue that any amendment would be futile, because the few additional allegations against the County Defendants fail to address the fundamental infirmities in the plaintiffs' claims that the County Defendants raised in their Motion to Dismiss. (Docket No. 55 at 5-7.)

The plaintiffs' Motion for Leave to Amend will be granted. The County Defendants' argument that the proposed amendments would be "futile" is nullified by the court's conclusion that the County Defendants' Motion to Dismiss should be, in almost all respects, denied. That said, the proposed Amended Complaint includes the FLSA claim asserted under Section 1983

---

[6] No objections to the proposed Amended Complaint have been filed by the Durrett Defendants.

(Docket No. 53 Ex. 1 at 27-28), and that claim would be subject to dismissal if asserted in the Amended Complaint.

## **CONCLUSION**

For the reasons expressed above, the County Defendants' Motion to Dismiss will be, in almost all respects, denied, and the plaintiffs' Motion for Leave to File First Amended Complaint will be granted.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge