IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JUANA MONTANO-PEREZ, *et al.*,       )
                                     )
        Plaintiffs,                  )
                                     )
v.                                   )        Case No. 3:08-1015
                                     )        Judge Trauger
DURRETT CHEESE SALES, INC., *et al.*,)
                                     )
        Defendants.                  )
                                     )

## MEMORANDUM

Pending before the court is the Plaintiffs' Motion for Assessment of Attorneys' Fees

Against Defendant Greg Durrett (Docket No. 177), to which defendant Durrett has responded

(Docket No. 187), and the plaintiffs have filed a reply in support (Docket No. 192). For the

reasons discussed herein, this motion (and the plaintiffs' related request for costs) will be denied.

### RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

On October 16, 2008, the plaintiffs, who are all former employees of Durrett Cheese

Sales, filed this case alleging that Greg Durrett, the company's owner, had failed to pay them for

weeks of work and created a hostile work environment at the Manchester, Tennessee cheese

processing facility, targeting the plaintiffs for verbal abuse due to their national origin (Mexico)

and race (Latino and some are members of the Mixteco indigenous group) and exploiting the

plaintiffs' lack of English-speaking skills. (Docket No. 1 at 2.)

The plaintiffs alleged that a peaceful workplace protest of their working conditions,

conducted on October 22, 2007, resulted in Durrett's contacting the Coffee County Sheriff's

1

Department and having the plaintiffs arrested for trespassing. (*Id.* at 14.) Following their improper arrest, the plaintiffs claim, Durrett and the Coffee County Sheriff's Department conspired to keep the plaintiffs in custody until they could be released to Immigration and Customs Enforcement. (*Id.* at 16.) The plaintiffs' release was eventually secured by their attorney. (*Id.* at 17.)

The plaintiffs sued Durrett, Durrett Cheese Sales (collectively "the Durrett Defendants"), Coffee County, and several individual members of the Coffee County Sheriff's Department. (*Id.* at 1.) The plaintiffs sued all defendants for violations of the Fair Labor Standards Act (FLSA), Section 1981, Section 1983, Section 1985, and for negligent infliction of emotional distress. (*Id.* at 18-29.) The plaintiffs also sued the Durrett Defendants for violations of the Tennessee Human Rights Act (THRA), malicious prosecution and intentional infliction of emotional distress. (Docket No. 62 at 29-36.) Among other things, the First Amended Complaint added three counts of Title VII discrimination against Durrett Cheese Sales. (*Id.*)

This case proceeded through about 18 months of discovery and motion practice, including a Motion to Dismiss filed by the Coffee County Defendants (which was granted in part and then cross-appealed based upon the qualified immunity determination) (Docket Nos. 60, 64, 67), the plaintiffs' Motion for Protective Order (Docket No. 77), and an entry of default against the now-bankrupt Durrett Cheese Sales (Docket No. 115).

On June 29, 2010, the court referred this case to Magistrate Judge Griffin for a settlement conference/mediation that was to be conducted on August 26, 2010. (Docket Nos. 127, 130.) The mediation with the Coffee County defendants was productive and resulted in a settlement

agreement and dismissal, with each party to bear their own "discretionary costs."  (Docket No.

153.)[1]  Despite the entry of default, the plaintiffs decided to dismiss their claims against Durrett

Cheese Sales, citing the company's bankruptcy and the settlement with other parties.  (Docket

Nos. 175-176.)

This leaves Greg Durrett.  Throughout this litigation, Durrett has apparently asserted that

he is on the brink of bankruptcy (his company already the subject of Chapter 7 liquidation), in

default on certain property loans, and "in trouble" with the IRS.  Indeed, in briefing here, Durrett

filed the "Personal Financial Settlement" that was used in the course of settlement discussion.

(Docket No. 195 Ex. A.)  This document purports that, as of July 29, 2010, Durrett had $500 in

cash and, when considering that he was significantly "underwater" on certain investments, his

net worth was negative $150,450.  (*Id.*)

In light of Durrett's weak financial condition, at the conclusion of the 13-hour mediation

(at approximately 10 p.m. on August 26, 2010), Durrett's *pro bono* counsel, Barbara Moss,

hand-drafted a one-page settlement agreement ("the Agreement") for Durrett to enter into with

the plaintiffs.  (Docket No. 157 Ex. A.)  The Agreement required Durrett to provide plaintiffs'

counsel with "a copy of the notice from the IRS" and "the most recent letter concerning default

on the house in Florida," and required Durrett to pay plaintiffs $2,500 "at the end of 30 days"

and "an additional $2,500 at the end of 60 days."  (*Id.*)  The Agreement was signed by Durrett

and plaintiffs' counsel that evening.  (Docket No. 157 at 1-2.)

_____

[1]Subsequent briefing has indicated that, as part of this settlement, Coffee County paid $50,000 toward the plaintiffs' attorney's fees.  (Docket No. 178 at 14.)

3

Under the Agreement, if "these conditions [$5,000 payment and delivery of supporting material] are met," the plaintiffs would dismiss the lawsuit against Durrett with prejudice and give Durrett "full releases." (Docket No. 157 Ex. A.) However, "if these conditions are not met, plaintiffs may enter an agreed judgment in the amount of $75,000." (*Id.*) Through the Agreement, Durrett also agreed to the "non-monetary relief referred to in the letter 8/20/2010." (*Id.*)

The "non-monetary relief" and "letter 8/20/2010" refer to an August 20, 2010 formal settlement offer made by the plaintiffs to all defendants in preparation for the mediation. (Docket No. 157 Ex. B.) As to Durrett, the offer required Durrett to agree that, should he own a business and manage employees in the future, he would not take (or allow others to take) similar actions to those that he was accused of taking in this case.[2] (*Id.*) The proposal afforded the plaintiffs and their counsel the right "to monitor Mr. Durrett's compliance with" these terms "for five years following entry of a settlement agreement." (*Id.* at 5.) Finally, the proposal dictated that any consent judgment would give the plaintiffs the right "to any costs and fees associated with enforcing any aspect of the settlement agreement in the event of breach." (*Id.* at 2.)

On October 20, 2010, the plaintiffs moved to enter the $75,000 judgment against Durrett and sought "an order directing that Defendant Durrett pay plaintiffs' appropriate attorneys' fees

---

[2]For instance, the proposed agreement would prohibit Durrett from, among other things, (1) retaliating against employees for "asserting their rights under any federal, state, or local laws," and (2) reporting employees "to any law enforcement agency" in response to "non-violent protests regarding wages or working conditions conducted . . . on company premises." (*Id.* at 3-5.) Also, the agreement would require Durrett to "personally monitor" his work environment to ensure that it is "free of unlawful discrimination" and to offer "any open positions" to the "plaintiffs first." (*Id.*)

4

and costs associated with enforcing the parties' settlement agreement." (Docket No. 157 at 1.) The motion recounted that the $2,500 check that Durrett had sent 30 days following the August 26, 2010 Agreement had bounced and, despite two gratuitous extensions from plaintiffs' counsel, Durrett had still not made the first $2,500 payment. (*Id.* at 2-4.) While Durrett had requested a third extension to October 20, 2010, the plaintiffs determined that they were within their rights to seek the $75,000 judgment. (*Id.* at 4-5.) Therefore, through the motion, the plaintiffs sought the $75,000 judgment and "leave to file a petition seeking all costs and attorneys' fees associated with their attempts to enforce the Agreement."[3] (*Id.*)

In responding to the plaintiffs' motion for the monetary judgment, Durrett stated that he had "no quarrel" with the entry of the $75,000 judgment but disputed that the plaintiffs were entitled to attorney's fees for enforcing the Agreement, given that the plaintiffs "are simply doing what all parties agreed would happen," that is, moving for a judgment in light of Durrett's failure to pay. (Docket No. 164 at 1-2.) Durrett referred to the plaintiffs' (at the time modest) request for attorney's fees as "piling on," given that Durrett could not afford the $5,000 settlement in the first place. (*Id.*)

_____

[3]On October 28, 2010, while the motion for monetary judgment was pending, the plaintiffs and Durrett jointly moved for entry of an agreed Order "memorializing the non-monetary relief agreed to in the parties' August 26, 2010 settlement agreement." (Docket No. 160 at 1.) The next day, the court entered the Agreed Order, which, consistent with the terms of the August 20, 2010 offer letter and the August 26, 2010 Agreement, imposed a series of restrictions on Durrett's conduct as a business owner or manager and also added a series of specific steps that the plaintiffs were allowed to take in order to "monitor" Durrett's conduct. (Docket No. 162 at 4-7.) Again, the Order stated that "plaintiffs shall be entitled to any costs and fees associated with enforcing any aspect of the settlement agreement in the event of breach by Durrett." (*Id.* at 6.)

5

In a brief reply, the plaintiffs asserted that Durrett had acted "in bad faith" by writing the bounced check and requesting the extensions, and that he should have simply allowed the $75,000 judgment to be entered, without requiring plaintiffs' counsel to expend energy trying to collect the $5,000.[4]  (Docket No. 166 Ex. 2 at 2.)  The plaintiffs suggested that, even if Durrett had not explicitly breached the Agreement, they might be entitled to sanctions, so Durrett could face "meaningful consequences for his delay tactics and misrepresentations regarding his intent to make settlement payments."  (*Id.* at 3.)

In a November 3, 2010 Order, the court stated that the plaintiffs' entitlement to attorney's fees was a "murky" issue, but "the Agreed Order provision for the payment of attorney's fees and costs [required to enforce the settlement] does not apply at this juncture."  (Docket No. 167 at 2.)  The court, however, recognized that the plaintiffs had raised the "bad faith" argument and allowed "the plaintiffs to move for attorney's fees and costs on this ground only."  (*Id.*).  The court directed the plaintiffs to file the proposed $75,000 judgment within five days and the "bad faith" attorney's fees motion within 10 days.  (*Id.*)

On November 8, 2010, the plaintiffs filed a proposed "Final Judgment" against Durrett, which would award the plaintiffs $75,000 plus post-judgment interest.  (Docket No. 169 Ex. 1.) The court entered the "Final Judgment" on November 10, 2010.  (Docket No. 171.)

------

[4]The plaintiffs claim that Durrett, in his response, stated that he was "fully aware" he was not "able to pay the settlement amount," that is, the $5,000, and, it was, therefore, bad faith by Durrett to string the plaintiffs along for two months.  (Docket No. 166 Ex. 2 at 2.)  However, in the response, Durrett (twice) explicitly stated that he thought he *would* be able to pay the $5,000 at the time of the August 26, 2010 Agreement but had not been able to come up with the money. (Docket No. 164 at 2.)  Moreover, it was plaintiffs' counsel who, apparently unsolicited, offered the first extension to Durrett.  (Docket No. 157 Ex. D.)

6

The next day, the plaintiffs moved "for consolidation of all remaining attorneys' fees petitions in this case" and for "a related extension" of time to file their "bad faith" attorney's fee petition. (Docket No. 172 at 1.) That is, in light of the Judgment against Durrett, the plaintiffs announced their intention to seek "all recoverable attorneys' fees and costs pursuant to Fed. R. Civ. P. 54(d) and available pursuant to the fee bearing statutes under which they asserted claims against Defendant Durrett." (*Id.* at 2.) The plaintiffs asked that they be allowed to consolidate their sanction-related attorney's fee motion with "any attorneys' fee motions" that they also might file. (*Id.*) The court granted the motion. (Docket No. 174.)

The plaintiffs timely moved for attorney's fees on December 9, 2010. (Docket No. 177.) Gone from the plaintiffs' submission is any focus on Durrett's "bad faith" in the settlement process or a request for sanctions. Rather, under the fee-shifting provisions of the FLSA, Section 1988 and the THRA, the plaintiffs seek $239,732 in attorney's fees, based upon the work – throughout this litigation – of four lawyers, two paralegals, and several legal interns. (*Id.* at 2-3.)

## ANALYSIS

### I.     Plaintiffs' Motion for Attorney's Fees

After recounting the Complaint allegations and procedural developments in this case, the plaintiffs claim that the Judgment entered on November 10, 2010 entitles them to "prevailing party" status in this case and recovery under the various fee-shifting statutes upon which they

7

sued.[5]  (Docket No. 178 at 5.)  The plaintiffs claim that their $239,732 request is reasonable because it is based upon a reasonable number of hours worked at a reasonable hourly rate, consistent with the well-accepted "lodestar" analysis.  (*Id.* at 5-6 citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).

In terms of the number of hours worked, the plaintiffs assert that the 1171.2 hours of attorney time and the 192.3 hours of paralegal time that were spent on this case are reasonable given the length of the litigation, the ten plaintiffs, the eight defendants, and the "extensive travel" and labor required to conduct discovery given the now far-flung plaintiffs and witnesses and Durrett's disorganized record-keeping/resistance to discovery.  (*Id.* at 6-7.)  The plaintiffs maintain that they have made every effort "to ensure that they do not charge Defendant Durrett for time expended on claims and litigation activities which are uniquely associated with other defendants" or for time spent on plaintiffs who withdrew or declined to prosecute their cases. (*Id.* at 8.)  Consistent with standard practice, the plaintiffs provide detailed billing records from the attorneys and paralegals who worked on this case, documenting the amount of time spent on each specific activity.  (Docket Nos. 179-181, 184-185.)

As to the reasonableness of the hourly rate, the plaintiffs argue that the claimed $400 per

---

[5]In recounting the procedural history, the plaintiffs claim that, in the November 3, 2010 Order, "the Court also awarded attorneys' fees associated with Plaintiffs' efforts to collect the promised settlement payments as a sanction for Defendant Durrett's dilatory tactics."  (Docket No. 178 at 4.)  The plaintiffs repeat this assertion elsewhere in the main brief and in their reply brief, asserting that the court has already "sanction[ed] Defendant Durrett for his post-settlement conduct."  (*Id.* at 12; Docket No. 192 at 4.)  In the November 3, 2010 Order, the court recognized that the plaintiffs had advanced the "bad faith" argument and allowed the plaintiffs *to move* for attorney's fees on that ground, but no fees were awarded.  (Docket No. 167.)

hour for local counsel Wade Cowen, $275 per hour for lead counsel Kristi Graunke and Monica

Ramirez of the Southern Poverty Law Center (SPLC), $175 for Tom Fritzsche (also counsel

from the SPLC, but less experienced), $125 for senior SPLC paralegal Jan Lanier, $100 for

junior SPLC paralegal Vinita Andrapalliyal, and $75 per hour for SPLC law student interns are

all reasonable hourly rates given previous determinations in this District, the experience of the

professionals involved, the complexity of this case, and the challenges of representing immigrant

workers.  (*Id.* at 8-12.)  Moreover, the plaintiffs maintain that, after applying the hourly rate

requested, they further ensured the reasonableness of their fee request by taking a 20 percent,

across-the-board discount and a 50-percent discount on travel time.  (*Id.* at 8, 15.)

    Recognizing that the "results obtained" is often a key consideration in determining

whether counsel is entitled to the award sought, the plaintiffs claim that counsel "achieved

excellent results in this litigation," citing the amount of the Final Judgment and the detailed

monitoring program to which Durrett agreed.[6] (*Id.* at 12 citing *Hensley*, 461 U.S. at 435.)

Finally, largely repeating earlier arguments, the plaintiffs walk through the oft-cited *Johnson v.*

*Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974) factors, again maintaining that, because

of the labor and skill required to litigate this difficult and time consuming case, the plaintiffs are

---

[6]While not key to the analysis below, the plaintiffs' assertion that the results achieved by
counsel against Durrett were "excellent" is somewhat dubious.  The plaintiffs obtained a $5,000
settlement against Durrett, or $500 for each remaining plaintiff – as compensation for what the
plaintiffs maintain were significant emotional injuries.  The $75,000 Judgment was not obtained
because of any substantive work performed by plaintiffs' counsel; it was obtained because
Durrett's financial situation was so dire that he could not come up with $2,500, despite having
almost two months to do so.  While the monitoring program is facially extensive, it requires that
Durrett be managing employees, something which Durrett does not appear to be in any position
to do.  (Docket No. 187 at 2.)

entitled to their full requested fee. (*Id.* at 15-20.)

In response, Durrett does not challenge the hours billed or hourly rates claimed as unreasonable. Rather, Durrett argues that the August 26, 2010 Agreement "was intended to resolve all claims." (Docket No. 187 at 2.) That is, "it was never contemplated that Mr. Durrett would have any liability other than a judgment against him for $75,000." (*Id.*) Durrett maintains that all parties to the August 26, 2010 Agreement understood that that document settled all claims and, moreover, the plaintiffs should not be considered "prevailing parties" for fee-shifting purposes because they merely "bludgeon[ed] an impoverished party into a settlement agreement for a nominal amount."[7] (*Id.* at 3-4.)

Durrett supports his response with a declaration from his counsel, Ms. Moss. (Docket No. 187 Ex. 1.) She states that, going into the mediation, all parties understood that Durrett's financial situation was "dire," compounded by his wife's severe illness, a $164,000 claim against him by the IRS, and foreclosure on his home. (*Id.*) In light of this, Moss argues, "there were never any discussions that left open the possibility that Plaintiffs' counsel" could seek attorney's fees and costs against Durrett, and, Moss maintains, Durrett never would have accepted such a settlement and Moss would have continued her *pro bono* representation in lieu of accepting such an agreement. (*Id.*) While Moss concedes that she should have done a better job clarifying that

_____

[7]Because the court determines that the August 26, 2010 Agreement settled this dispute and precludes the recovery of fees and costs under the fee-shifting statutes, it is not necessary to reach the issue of whether the plaintiffs were "prevailing parties" against Durrett. Additionally, Durrett suggests that, if the court has "any doubt about the scope of the settlement," it should refer this motion to Judge Griffin for resolution, as she presided over the August 26, 2010 mediation. (*Id.* at 3.) As discussed below, the intent of the August 26, 2010 Agreement is clear from the record and referral to Judge Griffin is not necessary.

10

fees and costs were not recoverable under the August 26, 2010 Agreement, she cites that she was "exhausted" at the time that she wrote the Agreement and that she was "foolishly trusting of opposing counsel." (*Id.* at 2-3.) Moss contends that she was "shocked" to receive the plaintiffs' motion and related bill of costs. (*Id.*)

In the reply, plaintiffs' counsel maintains that they do not recall any discussion at the mediation indicating that they would be barred from seeking attorney's fees following the entry of the $75,000 Judgment and that the August 26, 2010 Agreement does not facially preclude recovery of attorney's fees. (Docket No. 192 at 3-5.) After achieving a court-ordered Judgment as the "prevailing party" in this civil rights litigation, the plaintiffs claim, they are entitled to their reasonable attorney's fees. (*Id.* at 5-6.)

In a hodgepodge of additional argument, the plaintiffs argue that the court should not be swayed by the "assumptions and speculation" of Durrett's counsel, the Agreement should be construed against Durrett because Moss drafted it, and that "Durrett's financial mismanagement is no defense to payment of costs and attorneys' fees."[8] (Docket No. 192 at 7-13.) Additionally, the plaintiffs note that they "forecasted" their intention to broadly seek attorney's fees in the motion to consolidate attorney's fee briefing, and, therefore, Moss should not be "shocked" by

---

[8]The plaintiffs claim that Durrett's "pleas of poverty" ring hollow in part because "he has on at least one occasion withheld a minimum of $2,500 he had available to apply toward Plaintiffs' judgment." (Docket No. 192 at 12.) The plaintiffs are apparently referring to an October 19, 2010 e-mail in which Durrett stated that he finally had the money to make the first payment under the August 26, 2010 Agreement and could wire the money that day. (Docket No. 157 Ex. G.) Plaintiffs' counsel rejected Durrett's offer to make the $2,500 payment under the Agreement, choosing instead to seek the $75,000 Judgment. (*Id.*) Simply, at the time that Durrett made his offer, there was no judgment toward which to apply Durrett's money.

11

their submission.[9]  (*Id.* at 10.)

It is clear to the court that the August 26, 2010 Agreement operated as a global settlement that precludes recovery for the plaintiffs here.  While there is no dispute that the statutes under which the plaintiffs sued (the FLSA, Section 1983, and the THRA) permit the recovery of attorney's fees for prevailing plaintiffs, such recovery is not permitted where the parties have fully settled their dispute.  *Jennings v. Metro. Gov't of Nashville*, 715 F.2d 1111, 1114 (6th Cir. 1983); *Evans v. Jeff D.*, 475 U.S. 717, 731-32 (1986).

When the settlement agreement is silent as to whether costs and fees are subsequently recoverable, courts must examine "whether the parties intended the settlement to be a final disposition of all claims."  *Jennings*, 715 F.2d at 1114.  While the court is to consider all of the facts and circumstances, where the agreement purports to represent a "full and complete settlement of all claims," the argument that the parties intended to fully settle (that is, no fees) the litigation is strengthened.  *See Toth v. UAW*, 743 F.2d 398, 406-07 (6th Cir. 1984).

In *McCuiston v. Hoffa*, 202 Fed. Appx. 858 (6th Cir. 2006), the parties entered into a consent judgment and the plaintiffs then sought substantial attorney's fees under the "common benefit" theory.  *Id.* at 859-60.  The court did not reach the issue of whether the plaintiffs were

_____

[9]While the plaintiffs recognize that Durrett is not "free of financial problems," they also suggest that his financial difficulties are overstated in part because Durrett "still runs his own food products business, now called Stones River Foods."  (Docket No. 192 at 12.)  No further information on Stones River Foods appears in the record, but Durrett and his counsel have repeatedly stated that Durrett has no employees nor plans to hire any.  (Docket No. 187 Ex. 1.)  Logically, if Durrett was in any kind of healthy financial position, he would have paid the $5,000 discussed in the August 26, 2010 Agreement, rather than subjecting himself to a $75,000 Judgment.

entitled to fees under this theory, because it determined that the district court correctly found that the consent judgment, which stated that it was a "final order of the court, disposing of all remaining claims," constituted in a "settlement in full," precluding the recovery of attorney's fees. *Id.*

The court reiterated that the important issue is the "intent" of the parties, that is, does the record reflect that the parties designed the agreement "to leave the claim for attorney fees unresolved" or to "constitute a settlement in full." *Id.* at 863. While this is an issue of fact, the court may make this determination "when the record permits only one inference." *Id.* at 865. In evaluating intent in *Hoffa*, the Sixth Circuit found that:

> a claim for attorney fees and costs was asserted in the complaint, but was not the subject of discussion at or prior to the settlement conference. The district court scheduled the settlement conference, and required that representatives with full authority to settle be in attendance. The terms of settlement were discussed and accepted, with no mention of the plaintiffs' claim for nearly $160,000 in attorney fees and costs. While this meant that no separate agreement was reached on the claim for attorney fees, it did not prevent the parties from agreeing to a settlement in full. The Stipulated Consent Judgment executed by the parties awarded plaintiffs injunctive relief, included no monetary damages of any kind, and purported to dispose of "all remaining claims." Plaintiffs point to no circumstances, except for their purposeful silence on the issue, to suggest that anything less than a comprehensive settlement was reached in this case. *Id.*

This case lines up squarely with *Hoffa*. Like *Hoffa,* while the plaintiffs sought attorney's fees and costs in their Complaint (Docket No. 134 at 41), there is no indication from the record that there was any discussion between Durrett's counsel and plaintiffs' counsel regarding attorney's fees, other than those fees that might be incurred enforcing the Agreement.[10] The

---

[10] The plaintiffs point to an "opening statement" delivered by plaintiffs' counsel at the mediation in which counsel reiterated that the plaintiffs seek, among other things, attorney's fees in this case. (Docket No. 189 at 1-2.) A general statement, made at the start of a mediation to all

13

Agreement itself makes no mention of attorney's fees and states that, if Durrett provides the appropriate documentation and $5,000 within the time limit, he will receive a "full release." (Docket No. 157 Ex. A.)

The Agreement does not suggest that, if Durrett fails to meet these terms, the plaintiffs retain all rights to fees and costs. Rather, the Agreement provides only one alternative – the plaintiffs may seek a $75,000 judgment and fees associated with enforcing that judgment.[11] Given the fact that all parties recognized Durrett was in poor financial straits, the only logical inference from the limited, alternative paths provided in the Agreement is that Durrett's liability was capped at $75,000 plus enforcement fees.

Simply, under the circumstances of the negotiation, the language of the Agreement, and Durrett's clear financial condition, it makes no sense that, following the Agreement, broad, prevailing party attorney's fees would still be available to the plaintiffs from Durrett. And, if the parties had so intended, the Agreement certainly would have said so. There is every indication from the record that the terms of August 26, 2010 Agreement were a "settlement in full," and,

_____

defendants, hardly indicates that the Agreement reached specifically between the destitute Durrett and the plaintiffs was intended to include the possibility of attorney's fee recovery.

[11]The plaintiffs are not entitled to recover even these limited fees at this time for several reasons. First, the court has already determined that the time spent pursuing Durrett for the $5,000 is not recoverable as "enforcing the agreement." (Docket No. 167 at 2.) Second, as to the "bad faith" argument, despite the plaintiffs' suggestion that Durrett was "fully aware" early on that he could not afford the $5,000 settlement, no evidence on this point has been brought forth, and the record simply lacks any evidence that Durrett acted in bad faith. Third, the plaintiffs were afforded the opportunity to brief the bad faith issue (in conjunction with briefing any other attorney's fees motion) and have not done so.

14

therefore, the plaintiffs are not entitled to attorney's fees or costs.[12]

## CONCLUSION

The plaintiffs' request for attorney's fees and costs will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

---

[12]On December 10, 2010, the plaintiffs filed a Bill of Costs with the Clerk, seeking $40,545.13 in costs from Durrett. The vast majority of the claimed costs are compensation for interpreters ($3,757.50) and "other costs," specifically "expert costs" and "travel costs" ($35,051.01). (Docket No. 182.) Under the Local Rules, the prevailing party may file a Bill of Costs with the Clerk (and serve the Bill of Costs on opposing counsel) within 30 days of Judgment, and the Bill of Costs must set a date (at least seven days after service on opposing counsel) for presentation of costs to the Clerk. L.R. 54.01. Within that seven-day period, the opposing party, if it seeks to challenge the costs, must file written objections. *Id.* In his December 15, 2010 response, Durrett repeatedly objected to the Bill of Costs, arguing that it should be "stricken in its entirety." (Docket No. 187 at 4.) While, following such objections, the Clerk is to resolve the costs issue in the first instance (with the court having an opportunity to review), here, because the fees and costs issue is already before this court, there is no reason to consume the resources of the Clerk in this manner. Without reaching the recovery issue on the merits, the court concludes that the "capped" nature of the obligations imposed by the August 26, 2010 Agreement precludes recovery of these costs and, therefore, the court will deny the plaintiffs' request for costs.

15